### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**KARA M. CARELLA,**

      **Plaintiff,**

**v.**                                                   **Case No: 5:16-cv-382-Oc-10PRL**

**COMMISSIONER OF SOCIAL SECURITY**

      **Defendant.**

_____

## REPORT AND RECOMMENDATION[1]

Plaintiff appeals the administrative decision denying her application for Disability Insurance Benefits ("DIB"). Upon a review of the record, the memoranda, and the applicable law, I submit that the Commissioner's decision should be affirmed.

### I.    BACKGROUND

On May 23, 2006, Plaintiff filed an application for DIB, alleging disability beginning June 14, 2005. (Tr. 73). On January 14, 2009, the Social Security Administration ("SSA") found that Plaintiff was disabled starting June 14, 2005 but that her condition was likely to improve. (Tr. 71–72). Upon a continuing disability review, the SSA found that Plaintiff ceased to be disabled beginning April 1, 2012. (Tr. 75). After further review of her disability claim (Tr. 103, 105–09), and at her request, a hearing was held before Administrative Law Judge Joseph F. Dent

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

("ALJ"), who then issued a notice of unfavorable decision, finding that Plaintiff's disability ended on April 1, 2012.   (Tr. 13–56, 77–91).

In his decision, the ALJ found that the most recent favorable medical decision, the Comparison Point Decision ("CPD"), was dated January 14, 2009.   (Tr. 82).   Under the CPD, Plaintiff had the following medically determinable impairments: degenerative disc disease; arthritis; and adjustment disorder.   Also under the CPD, these impairments resulted in the following Residual Functional Capacity ("RFC"): Plaintiff could "lift and carry no more than 10 pounds. She could stand and walk for no more than 4 hours total in an 8-hour workday and sit for no more than 4 hours total in an 8-hour day. She could not reach with her left upper extremity. She could not climb, stoop or bend. She must avoid temperature extremes."   (Tr. 82).

Then, the ALJ found that Plaintiff had not engaged in substantial gainful activity though April 1, 2012.   (Tr. 82).   The ALJ next determined that—as of April 1, 2012—Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and cervical spine; cervicalgia; degenerative joint disease bilaterally knees, right greater than left; asthma; obesity; and anxiety disorder with panic attacks.   (Tr. 82).

According to the ALJ, from April 1, 2012 onward Plaintiff did not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 83).   The ALJ then found that Plaintiff experienced an improvement in the medical severity of the impairments present at the time of the CPD and that the improvement was related to her ability to work because it increased her RFC.   (Tr. 83).

Next, the ALJ found that from April 1, 2012, Plaintiff retained the RFC to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b):

[Plaintiff can] perform light work as defined in 20 CFR 404.1567(b) except with a sit/stand option allowing her to alternate between sitting and standing positions at

- 2 -

30–60 minute intervals throughout the workday; occasionally push and pull bilaterally with the upper extremities and foot control operation with the lower extremities; occasionally climb ramps or stairs, balance, stoop, kneel, and crouch; never climb ladders, ropes, or scaffolds, and never crawl; occasionally reach overhead bilaterally and frequently reach in all other directions bilaterally; frequent bilateral handling and fingering; avoid concentrated exposure to extreme temperatures, excessive vibration, and irritants such as fumes, odors, dust, gases, and poorly ventilated areas; avoid all exposure to hazardous machinery and unprotected heights; work is limited to simple, repetitive, and routine tasks in low stress jobs defined as having only occasional decision-making and changes in the work setting while having only occasional interaction with the public.

(Tr. 84–89).   The ALJ determined that Plaintiff had no past relevant work as of April 1, 2012. (Tr. 89–90).

However, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform—ticket taker, ticket seller, cashier II.   (Tr. 90–91).   Thus the ALJ found that Plaintiff's disability ended on April 1, 2012.   (Tr. 91).

Finally, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.   (Tr. 1–6).   With her administrative remedies exhausted, Plaintiff filed the instant appeal.   (Doc. 1).

## II.   STANDARD OF REVIEW

A claimant is entitled to disability benefits when he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to either result in death or last for a continuous period of not less than twelve months.   42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).

The Commissioner has established a five-step sequential analysis for evaluating a claim of disability, which is by now well-known and otherwise set forth in the ALJ's decision.   *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir.

2001).   The claimant, of course, bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner.   *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The scope of this Court's review is limited to a determination of whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)).   Indeed, the Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).   Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.   *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).   Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.   *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).   This is clearly a deferential standard.

### III.   DISCUSSION

Plaintiff raises two arguments on appeal: (1) the ALJ failed to fully and fairly develop the record and (2) the ALJ improperly relied on the testimony of the Vocational Expert.   I disagree.

### A.  The ALJ adequately developed the record

It is well-settled that the ALJ has a basic obligation to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).[2]  This duty, however, does not relieve Plaintiff of her burden of proving that she is disabled, and consequently, Plaintiff is still responsible for producing evidence in support of her claim.  *Ellison v. Barnhart*, 355 F.3d 1272 (11th Cir. 2003).

Thus "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record."  *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997).   The court should be guided by whether the record shows evidentiary gaps that result in unfairness or clear prejudice.   *Id.*   In other words, to show that remand is necessary, the plaintiff must "identify 'what facts could have been submitted . . . that would have changed the outcome.'"   *Correa v. Colvin*, No. 8:15-CV-461-T-TGW, 2016 WL 7334642, at *4 (M.D. Fla. Mar. 18, 2016) (quoting *Edwards v. Sullivan*, 937 F.2d 580, 586 (11th Cir. 1991)).   At the very least, this "requires a showing that the ALJ did not have all of the relevant evidence before him [or her] in the record . . . , or that the ALJ did not consider all of the evidence in the record in reaching his [or her] decision."   *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985).

At issue here are various medical records that were not included in the record at the time of the hearing before the ALJ and some of which are still absent from the record before the Court.

---

[2]  When the right to representation has not been waived, however, the ALJ's "basic obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appears before him."  *Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *Id*.  Here, Plaintiff was informed of her right to representation, and she waived this right in writing. (Tr. 16, 162).  Plaintiff has not challenged her waiver of this right (Pl.'s Br. at 18–21), thus the ALJ did not have a special or enhanced duty to develop the record.

Plaintiff asserts that she brought these records to the attention of the ALJ in two different ways: (1) by submitting a form to the ALJ that identified the sources of some of the records and (2) by identifying other sources at the hearing before the ALJ.

But before I examine the specific records at issue, I note that Plaintiff simply fails to argue—aside from pointing to the mere absence of the records—how she has suffered any evidentiary gap resulting in unfairness or clear prejudice, see *Graham*, 129 F.3d at 1423; how any of the records would change the outcome here, see *Edwards*, 937 F.2d at 586; or how the ALJ lacked all of the relevant evidence in order to decide this case, see *Kelley*, 761 F.2d at 1540.   (*See* Pl.'s Br. at 18–21).   Thus, as explained *infra*, I am compelled to submit that the ALJ adequately developed the record.

1.    As to the medical sources identified in the form, Plaintiff filed a *Claimant's Recent Medical Treatment* form on April 15, 2014 (the date of the hearing), indicating that she had been treated by Oscar Lindo, M.D.; had received treatment at CMPM Pain Management (with an address of George St., New Port Richey) and at Telip Chiropractic; and had been hospitalized at Oak Hill Hospital.   (Tr. 282, *see also* Tr. 15–16 (it appears that the ALJ noted this form during the hearing)).   The Commissioner obtained the records from Dr. Lindo and Oak Hill Hospital.   (Tr. 522–628).   Telip Chiropractic responded to the Commissioner's request for Plaintiff's medical records by asserting that Plaintiff "never was seen in our office" but that she had cancelled a scheduled appointment (Tr. 9–11); and Plaintiff does not cite to any evidence to show that she actually received treatment from Telip Chiropractic, see (Tr. 284–313) (Plaintiff's *Explanation of Benefits* from United Health Care of Florida dating from early 2010 to 2013, which fails to show any treatment by Telip Chiropractic).

But there is no evidence in the record showing that the Commissioner ever attempted to contact CMPM Pain Management and the Commissioner does not produce any such evidence here. (Df.'s Br. at 9–10).   In any event, Plaintiff's *Explanation of Benefits* from United Health Care of Florida show that Comprehensive Pain Management Partners, LLP[3] treated her in March and April of 2010—a full two years before her cessation of disability.   (Tr. 287–88; *see also* Tr. 35 (Plaintiff mentioned that "CPMP or CMPM" had been "following" her and "taking care" of her to the ALJ when discussing her back epidural injections)).

Assuming that CMPM Pain Management and Comprehensive Pain Management Partners, LLP are the same entity, which treated Plaintiff, she does not explain how the March and April 2010 records show that she has disabling or additional limitations that the RFC does not account for.   For instance, though the ALJ outlined Plaintiff's pre-cessation medical history, including medical records spanning 2010 through 2011 (Tr. 86, 316–39), Plaintiff does not explain how CMPM Pain Management records from 2010 would augment those records.   Additionally, Plaintiff does not identify what prejudicial evidentiary gap, if any, that these missing records would fill: i.e., Plaintiff does not assert on appeal that CMPM Pain Management treated her beyond or before March and April of 2010; she does not assert what CMPM Pain Management treated her for (though it is possible to infer from the hearing transcript that CMPM Pain Management was giving her epidural shots, see Tr. 35); and she does not identify what facts the records from CMPM Pain Management would reveal that would change the outcome of this case.

Further, even assuming that CMPM Pain Management treated Plaintiff for her back pain, a consultative examination conducted on June 23, 2012 by Yamil Vidal, M.D., (Tr. 86, 487–91)

---

[3] This firm does appear to have an office in New Port Richey off of St. George Street, see http://psp226.sb.siliconmtn.com/locations.

showed that Plaintiff's range of motion was slightly decreased with forward flexion, but the rest of her range of motion was within normal limits; strength was 5/5; sensory examination was normal; straight leg test was positive on the left leg with normal reflexes bilaterally; was able to ambulate without an assistive device; fine motor skills were normal and she was able to open doorknobs; was able to squat and rise from a seated position; was able to walk only on toes, but walking on her heels provoked bilateral back pain that radiated down to the leg; tandem walk was normal, but she did not attempt to hop; and there was some evidence of radiculopathy, especially in the lumbar region and there was some evidence of cervical spasms as well.   (Tr. 490).   The ALJ found that the above findings were consistent with the opinion of the state agency physician (Tr. 89), whose opinion the ALJ gave substantial weight to and who found that Plaintiff can lift twenty pounds occasionally, ten pounds frequently, stand or walk for six hours, sit for six hours, and push or pull without limit.   (Tr. 515–21).   Notably, Plaintiff does not take issue with the above findings, the weight given to the state agency physician, or assert that records from CMPM Pain Management would somehow refute those findings.

And, in the alternative, assuming that CMPM Pain Management treated Plaintiff for her knee pain, I note that on March 23, 2012, William J. Jason, M.D., found that upon examination Plaintiff walked with a normal gait; she was tender anterolaterally, but not at the lateral joint line or iliotibial band; she had a full range of motion, minimal swelling, no effusion; her skin was intact; her knee was ligamentously stable with 5/5 strength of the hamstrings and quadriceps; her MRI scan showed fairly normal findings with no lateral meniscus tear or medial meniscal tear and minimal, if any, degenerative changes.   (Tr. 86, 457–48).   As above, Plaintiff does not take issue with any of these findings and fails to assert how records from CMPM Pain Management would somehow contradict these findings.

2.      As to the records that Plaintiff identified at the hearing, Plaintiff discussed with the ALJ her epidural back injections and that she was awaiting MRI testing in order to proceed with implanting a spinal cord stimulator.   (Tr. 29–30).   At the hearing's end, the ALJ asked Plaintiff to deliver a copy of the MRI results to him.   (Tr. 55).   Plaintiff asserts that the MRI was performed and that she hand-delivered a copy of the testing "to the New Port Richey Field Office for submission to [the] ALJ."   (Pl.'s Br. at 20).

But despite this assertion, the MRI results at issue are not in the record, and Plaintiff fails to claim that she submitted the MRI records to the Appeals Council or to this Court.   And more to the point Plaintiff fails to make any assertion that the MRI shows a disabling or additional limitation that the RFC fails to account for—i.e., Plaintiff fails to state or explain what clear prejudice she has suffered due to the missing test results or what evidentiary gap these records would fill.   For instance, Plaintiff does not argue that the MRI findings would somehow undermine Dr. Vidal's largely normal examination findings or the state agency physician's findings that she can lift twenty pounds occasionally, ten pounds frequently, stand or walk for six hours, sit for six hours, and push or pull without limit.   *See supra* sub-section III.A.1.

Related to this argument, Plaintiff also argues that the ALJ failed to investigate into the evidence of Plaintiff's back epidural injections and potential spinal cord stimulator implantation, both of which Plaintiff addressed with the ALJ during the hearing.   (Pl.'s Br. at 19–20).   To this end, she asserts that Mark Haskim, M.D., was providing her epidural shots and considering implanting a spinal cord stimulator, as evidenced by Plaintiff's April 2012 *Disability Report– Appeal* form submission.   (Tr. 252).   But, like her argument about the missing MRI, Plaintiff makes no assertions about how Dr. Haskim's records would matter: her only assertions are that she testified that she underwent a "psych[ological] evaluation;" was deemed "a good candidate"

for a spinal cord implant; and that the ALJ "failed to obtain any specifics regarding the doctor that performed this examination and no where did the ALJ acknowledged in his decision that a person in need of a spinal cord stimulator must be suffering from chronic severe pain."   (Pl.'s Br. at 20). Yet to the contrary the ALJ discussed Plaintiff's epidural injections and possible spine implantation during the hearing (Tr. 29–30) and he discussed her back pain epidural treatment in his decision (Tr. 86, 88) (noting that Plaintiff failed to mention that she received ongoing injections to the consultative examiner and during emergency room visits after 2011 and that Plaintiff tended to exaggerate her pain levels); but Plaintiff does not claim that she has provided any evidence to the ALJ, the Appeals Council, or the Court showing that she ever received a spinal cord stimulator implantation or that such an implant produced disabling or additional limitations not accounted for by the RFC.

Accordingly, given the absence of a showing that a prejudicial evidentiary gap exists, any error committed by the ALJ does not rise to the level necessary to remand for further proceedings. *See Ellison*, 355 F.3d at 1276; *Graham*, 129 F.3d at 1423; *Kelley*, 761 F.2d at 1540.

### B.  The ALJ properly relied on the Vocational Expert's testimony

The ALJ relied on Vocational Expert's (VE) testimony in finding that Plaintiff could perform a significant number of jobs in the national economy.   Plaintiff argues that the ALJ could not rely on the VE's testimony because it conflicted with the *Dictionary of Occupational Titles* ("DOT") and the *Selected Characteristics of Occupations defined in the Dictionary of*

*Occupational Titles* ("SCO"), and thus the testimony was unreliable to prove that Plaintiff could perform other work.[4]

To support her argument Plaintiff points to Social Security Ruling ("SSR") 00–4p, which states that when a VE provides evidence about the requirements of a job or occupation, the ALJ has an affirmative responsibility to ask about any possible conflict between that VE's testimony and the DOT (and assumedly the SCO too).   *See Leigh v. Comm'r of Soc. Sec.*, 496 Fed. Appx. 973, 975 (11th Cir. 2012).   When the VE's testimony is inconsistent with the DOT, the ALJ must resolve this conflict before relying on the VE to determine whether the individual is or is not disabled.   *Id.*   Still, SSR 00–04p merely obligates the ALJ to ask the VE if there is a conflict and if the VE identifies a conflict the ALJ is required then—and only then—to address the conflict in his decision and resolve it.   *Brijbag v. Astrue*, No. 8:06-CV-2356-T-MAP, 2008 WL 276038, at *2 (M.D. Fla. Jan. 31, 2008) (holding that "the ALJ need not independently corroborate the VE's testimony and should be able to rely on such testimony where no apparent conflict exists with the DOT").

But "when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT."   *Jones*, 190 F.3d at 1229–30 (page number omitted).   Indeed, SSR 00–4p anticipates that the DOT may not contain all relevant information, and the VE may obtain information about a particular job's requirements from sources other than the DOT, such as reliable publications or the

---

[4] The DOT is a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy.   *See Estrada v. Barnhart*, 417 F. Supp. 2d 1299, 1302 (M.D. Fla. Feb. 24, 2006).   Although the DOT "provides occupational information on jobs in the national economy" it "is not comprehensive" nor "the sole source of admissible information concerning jobs."   *Jones v. Comm'r of Soc. Sec.*, 423 Fed. App'x 936, 938 (11th Cir. 2011) (*quoting Jones v. Apfel*, 190 F.3d 1224, 1230 (11th Cir. 1999)).   "The SCO provides more detailed occupational data than that contained in the DOT."   *Bazain v. Colvin*, No. 11-22621-CIV, 2015 WL 5737179, at *21 (S.D. Fla. Sept. 30, 2015).

VE's own experience in job placement or career counseling.  *Chambers v. Comm'r of Soc. Sec.*, No. 16-11971, 2016 WL 7010878, at *3 (11th Cir. Dec. 1, 2016) ("[E]ven if there was a conflict between the DOT and the jobs identified by the vocational expert in response to the hypothetical question, the testimony of the vocational expert outweighs the DOT because the DOT is not the sole source of admissible information concerning jobs."); *Kerridge v. Comm'r of Soc. Sec.*, No. 6:10-cv-1009-Orl-DAB, 2011 WL 3739025, at *10 (M.D. Fla. Aug. 22, 2011).

Plaintiff asserts here that the RFC limitation of only occasional interaction with the public conflicts with the requirements of the occupations that the VE identified—ticket taker, ticket seller, and cashier II, all of which require frequent or constant hearing and talking according to the DOT and SCO.  (Pl.'s Br. at 21–22).   Yet the ALJ specifically asked the VE to consider a person who was limited to only "occasional interaction with the public."  (Tr. 46).   And the VE then reduced the number (by seventy-five percent) of those identified jobs "due to the occasional public interaction" limitation.  (Tr. 46–47).   When the ALJ asked the VE whether the reduction in the number of jobs that Plaintiff could perform was "pursuant to the Dictionary of Occupational Titles," the VE responded "[e]xcept as noted and my answers were based on my professional training and experience in the field."  (Tr. 51).

Then, in the ALJ's decision, he explained that the VE's testimony that "the number of approximate number of jobs [that Plaintiff can perform] is reduced by 75% due to limitations of only occasional interaction with the public."  (Tr. 90–91).   The ALJ further noted that "[t]he vocational expert indicated that he relied on his education, training and experience for those portions of his testimony regarding jobs allowing for . . . only occasional interaction with the public" and that "pursuant to SSR 00–4p, the undersigned has determined that the vocational

expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."   (Tr. 91).

Even assuming that there was an inconsistency between the testimony and the DOT (and the SCO), the ALJ did not err in relying on the VE's opinion to determine that Plaintiff could perform other work.   In other words, the VE's testimony, which the ALJ relied upon, trumps the DOT (and the SCO) if an inconsistency exists.   *See e.g., Leigh v. Comm'r of Soc. Sec.*, 496 Fed. App'x 973, 975 (11th Cir. 2012); *Hurtado v. Comm'r of Soc. Sec.*, 425 Fed. App'x 793, 796 (11th Cir. 2011).   Thus—to the extent the ALJ erred by finding that the VE's testimony and the DOT are consistent—any error was harmless.   *Jones v. Comm'r of Soc. Sec.*, 423 Fed. Appx 936, 939 & n.4 (11th Cir. 2011) (noting that "[i]n this Circuit, a VE's testimony trumps the DOT to the extent the two are inconsistent;" that "Social Security Rulings are not binding on this Court;" and that " the ALJ arguably discharged his duty under SSR 00–04p by asking the VE about inconsistencies with the DOT, and then noting in his decision that the VE had explained that over half the cashier positions the DOT classified as light work were actually sedentary work.").

As Plaintiff does not claim that the ALJ's hypothetical question to the VE failed to include all of his impairments, the VE's testimony as to the existence of work in the national economy is substantial evidence supporting the ALJ's finding that she can perform a significant number of jobs.

## IV.   RECOMMENDATION

For the reasons stated above, it is respectfully **RECOMMENDED** that the ALJ's decision should be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

**Recommended** in Ocala, Florida on February 23, 2017.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties